IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TRIMR, LLC, | ) |
|       Plaintiff, | ) |
| v. | ) C.A. No. 18-1640 (MN) |
| PERFECTSHAKER, INC. and 1535674 ALBERTA, INC. | ) |
|       Defendants. | ) |

## MEMORANDUM ORDER

At Wilmington this 28th day of October 2019:

As announced at the hearing on October 21, 2019, IT IS HEREBY ORDERED that the disputed claim terms of U.S. Patent No. 9,839,888 ("the '888 Patent") are construed as follows:

1. "substantially vertical member" has its plain and ordinary meaning ('888 Patent, claims 1, 2, 3, 4, 5, 7, & 10)

2. "contact point" means "a point or a region of the agitator that touches the substantially vertical member" ('888 Patent, claim 1)

3. "agitator" means a "coiled wire" ('888 Patent, claims 1, 4, 5, 6, 8, & 9)

The parties briefed the issues (*see* D.I. 58, D.I. 59) and submitted a Joint Claim Construction Chart containing intrinsic evidence (*see* D.I. 54). Neither party provided a tutorial describing the relevant technology. The Court carefully reviewed all submissions in connection with the parties' contentions regarding the disputed claim terms, heard oral argument (*see* D.I. 62), and applied the following legal standards in reaching its decision:

## LEGAL STANDARDS

"[T]he ultimate question of the proper construction of the patent [is] a question of law," although subsidiary fact-finding is sometimes necessary. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837-38 (2015). "[T]he words of a claim are generally given their ordinary and

customary meaning [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc) (internal citations and quotation marks omitted). Although "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim also must be considered. *Id.* at 1314. "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted).

The patent specification "is always highly relevant to the claim construction analysis . . . [as] it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). It is also possible that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. "Even when the specification describes only a single embodiment, [however,] the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) (internal quotation marks omitted) (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004)).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). The prosecution history, which is "intrinsic evidence, . . . consists of the complete record of the proceedings before the [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317.

"[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

In some cases, courts "will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S. Ct. at 841. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. Expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Phillips*, 415 F.3d at 1318. Nonetheless, courts must not lose sight of the fact that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* Overall, although extrinsic evidence "may be useful to the court," it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19. Where the intrinsic record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583).

## I. THE COURT'S RULING

The Court's rulings regarding the disputed claim terms of the '888 Patent were announced from the bench at the conclusion of the hearing as follows:

> . . . At issue is United States Patent No. 9,839,888, titled "Shakeable Container with Agitator." There are three terms in dispute, or originally there were three terms in dispute, and I am

3

prepared to rule on each of those disputes. I will not be issuing a written opinion, but I will issue an order stating my rulings. I want to emphasize before I announce my decisions that while I am not issuing a written opinion, we have followed a full and thorough process before making the decisions I am about to state. I have reviewed the '888 Patent, the portions of the prosecution history submitted and the joint appendix. There was full briefing on each of the disputed terms and there has been argument here today. All of that has been carefully considered.

Now as to my rulings. I am not going to read into the record my understanding of the claim construction law generally. I have a legal standard section that I have included in earlier opinions, including in my relatively recent order in *OmegaFlex v. Ward Manufacturing*, Civil Action No. 18-1004. I incorporate that law and adopt it into my ruling today and I will also set it out in the order that I issue.

With respect to the person of ordinary skill in the art in this case, it does not seem that either party has offered a definition of that person or his or her experience level. But the parties agreed here today that there is not any dispute over the person of ordinary skill in the art that would be relevant to these claim construction proceedings.

The first disputed term is "substantially vertical member" in claims 1, 2, 3, 4, 5, 7, and 10 of the '888 Patent. Plaintiff's proposed construction is "plain and ordinary meaning." Defendants' proposed "a straw with openings on opposite ends."

I will construe the term to have its ordinary meaning.

This construction is consistent with the ordinary meaning of the claim language and patentee's use of it. The claim language chosen was a substantially vertical member – not a straw. The applicants knew how to claim a straw when they chose – and in fact did so during prosecution and in a dependent claim. Claim 10 depends on claim 1 with one addition – that the "substantially vertical member is a straw." This brings into play the doctrine of claim differentiation, which the Federal Circuit has recognized is based on "the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope." *Andersen Corp. v Fiber Composites, LLC*, 474 F.3d 1361, 1369-70 (Fed. Cir. 2007). "To the extent that the absence of such difference in meaning and scope

would make a claim superfluous, the doctrine of claim differentiation states the presumption that the difference between claims is significant." *Id.*

Here, as I noted, claim 10 is dependent on claim 1, and claims in totality "the shakeable beverage bottle of claim 1, wherein the substantially vertical member is a straw." If the term "substantially vertical member" were construed to mean a straw, as Defendants propose, claim 10 would be superfluous.

And here, Defendants have not overcome the presumption that the difference is significant. The specification does not use the term "substantially vertical member" or any of those words, but it does depict such a construct in Figures 1, 2, 3, 4, and 5. The specification refers to the vertical piece depicted in [the] figures as a straw, but it also describes that piece as something functioning as other than a straw. For example, in column 1, lines 45 through 47, it refers to the agitator moving up and down the affixed straw. And in column 2, lines 1 through 9, it describes the straw in conjunction with the lid as something to connect to the agitator and keep the agitator from getting lost. In column 5, lines 59 through 62, the [vertical piece] keeps the agitator in place and allows it to move freely up and down.

The construction is also supported by the prosecution history. In the original application, patentee claimed a container with *inter alia* a straw that extends vertically from the lid. In the November 14th, 2016 Preliminary Amendment, the patentee broadened its claims by amending them to include the language "substantially vertical member" in place of the word "straw." The patentee apparently viewed the terms differently or presumably would not have made the change. The Patent Office accepted the broadening amendment without comment.

Defendants have raised some issues regarding the validity of the claims if I construe the term to have its plain and ordinary meaning. Those issues were not briefed and are not before me at this stage of the proceedings.

I will thus construe the term to have its plain and ordinary meaning. And for the sake of clarity, I confirm that the member need not be a straw.

The second disputed term is "contact point," which is in claim 1 of the '888 Patent. Plaintiff originally proposed that "contact point" be construed to mean "a section of the wire agitator

that is coiled closely around the circumference of the vertical member without being tightly affixed to the vertical member." Defendants originally countered that "contact point" should be construed as "a point where any portion of a coil physically touches the vertical member."

Here, I will construe this term to mean a point or a region of the agitator that touches the substantially vertical member.

During the course of these proceedings, it appears that both parties have agreed to that construction. Plaintiff agreed that "that gets us there" if we refer to a region of the agitator in which the agitator can physically touch the substantially vertical member. Plaintiff also clarified that although touching, the agitator is not bound to the member. And when I asked if I were to construe the term to mean a point or a region of the agitator that touches the substantially vertical member, Defendants said that "was exactly right."

In addition, this construction is supported by the intrinsic evidence.

The plain and ordinary meaning of the term "contact" is to touch. That is evident from the dictionaries referenced in the joint brief, including Merriam-Webster, dictionary.com and dictionary.cambridge.org.

That ordinary meaning is how the term is used in the claim, which makes clear that the agitator is "connected" to the vertical member at the three points of contact, suggesting a physical connection via the points of contact. This is further bolstered by the language making clear that those three are the only points of contact, i.e., that "there is no contact between the agitator and the substantially vertical member except for the first, second and third points." The connection must be made through the three points of contact – and only those three.

The construction is also supported by the specification, which uses the word "contact" in its ordinary sense to mean touch. For example, at column 4, lines 44 through 45, it states that "in some embodiments the flange 18 is in contact with a base 25 of the container" and in others it is not in contact. And in discussing Figure 4, at column 5, lines 3 through 5, the specification states: "This embodiment also shows that flange 18 does not contact the base 25 of the container."

Like the claims, the specification makes clear that the reason for the contact points is that they serve to connect the vertical piece and the agitator together. The specification states, in column 4, lines 39 through 41, that "the agitator 14 creates several points of contact with straw 12 creating a connection with the straw."

Plaintiff's originally proposed construction reads out the concept of contact. Moreover, it was unclear from Plaintiff's proposal what "closely" or "tightly" means or how the use of those terms would aid in understanding the term.

To be clear, I am not construing the term to mean a single point. There is no embodiment that requires that. Figure 17 appears to show different regions – not single points. And in the prosecution history, the patentee referred to contact points or regions in describing the invention.

The third and final originally disputed term is "agitator" in claims 1, 4, 5, 6, 8 and 9 of the '888 Patent. The parties today agreed to the construction of that term as a "coiled wire." And I will adopt that construction.

_____
The Honorable Maryellen Noreika
United States District Judge